Pasquale VESCIO and Vatsala Vescio, Counterclaim Plaintiffs,

v.

The MERCHANTS BANK, Counterclaim Defendant.

No. 2:99CV317.

United States District Court, D. Vermont.

Oct. 10, 2001.

Scot L. Kline, Miller, Eggleston, & Cramer, Ltd., Burlington, VT, John H. Henn, Foley, Hoag & Eliot LLP, Boston, MA, for Merchants Bank.

Robert K. Reis, Webber, Reis, Holler & Urso, LLP, Jess Thomas Schwidde, Glinka & Schwidde, S. Stacy Chapman, III, Chapman & Kupferer, Ltd., Rutland, VT, Lisa L. Chalidze, Miller, Faignant & Behrens, P.C., for Pasquale J. Vescio and Vatsala Vescio.

Melissa A. D. Ranaldo, AUSA, Office of the United States Attorney, Burlington, VT, for Federal Deposit Insurance Corporation and Board of Governors of the Federal Reserve System.

John Joseph Kennelly, Pratt, Vreeland, Kennelly, Martin & White, Ltd., Rutland, VT, for Southeast Investments, Inc.

Jacob Benjiman Perkinson, Johnson & Perkinson, South Burlington, VT, for Ronald Ferris and Herman Holmes.

Julie D.M. Sovern, Vermont Department of Banking, Insurance, Securities and Health Care Administration, Montpelier, VT, for State of Vermont, Commissioner of the Department of Banking, Insurance, Securities and Health Care Administration.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, District Judge.

This adversary proceeding arose out of Counterclaim Plaintiffs' failed attempt, with over $1.76 million in financing from Defendant The Merchants Bank ("TMB" or "the Bank") and more than $300,000 from unsecured creditors, to build and operate a grocery store on a parcel of real estate known as "Brattleboro West Phase II" in Brattleboro, Vermont. At issue is a lending relationship between the parties (which also involved miscellaneous loans unrelated to the grocery store) that began in 1991 and ended on June 30, 1995, when TMB sold its remaining Vescio loans with a face value of $1,671,303.82 for $892,260 to

AMRESCO New England II ("AMRESCO").

Counterclaim Plaintiffs Pasquale and Vatsala Vescio ("the Vescios") filed a voluntary bankruptcy petition under Title 11 of the United States Code on February 11, 1996. The Vescios have asserted a number of claims now before this Court, essentially alleging that TMB is responsible for both its own losses and all of the Vescios' alleged losses. Proceeds of this action, if any will fund the Vescios' amended chapter 11 plan of reorganization that the U.S. Bankruptcy Court for the District of Vermont confirmed on August 19, 1996.

### I. Procedural History

TMB filed a Complaint for Foreclosure against the Vescios' commercial properties in Windham Superior Court on February 2, 1995. The Bank then filed another foreclosure action against the Vescios residence on April 20, 1995. The Vescios responded by raising a number of affirmative defenses, as well as eight counterclaims which are the subject of this litigation. First the Vescios contend that TMB sufficiently "controlled" their business decisions to justify holding the Bank responsible for their losses under a lender liability theory. They also raise breach of contract and good faith and fair dealing claims arising out of the loan documents executed in July 1993. They also bring a number of tort claims, including a claim of tortious interference with contractual relationships arising out of the Bank's decision to exercise its assignment of rents, a claim that the Bank's loan officers made fraudulent misrepresentations, a negligence claim, a negligent misrepresentation claim, and a claim that the Bank negligently supervised its employees.

The Vescios filed for Chapter 11 bankruptcy protection in the United States

Bankruptcy Court for the District of Vermont on February 19, 1996. The adversary proceeding arising from the Bank's foreclosure action was then removed to the bankruptcy court on March 25, 1996. The parties waived their rights to a jury trial. After an amendment to the counterclaims, extensive discovery and the resolution of a number of dispositive motions, the matter proceeded to trial before U.S. Bankruptcy Judge Francis Conrad on October 29, 1997. Trial extended for twenty-six days on an interrupted basis, eventually concluding on November 16, 1998. The parties submitted extensive post-trial proposed findings and memoranda, and Judge Conrad took the matter under advisement. However, Judge Conrad was not reappointed to his judicial position and resigned before issuing a decision in this matter.

On August 10, 1999, TMB moved to withdraw the reference. This Court granted that motion on September 20, 1999. The Court proposed that the parties proceed to trial under Rule 63 of the Federal Rules of Civil Procedure. The parties eventually entered into a stipulation agreeing to permit this Court to decide the case based upon the evidence introduced during the trial before Judge Conrad, thereby waiving any rights to submit additional evidence. The Court granted the stipulated request to proceed or the record on April 18, 2000. The Court hereby certifies pursuant to Fed.R.Civ.P. 63 that it has reviewed the transcript of the trial, together with the exhibits, and that the proceedings in this case may be completed without prejudice to the parties.

## II. Findings of Fact

### A. Identification of parties, agents, entities

1. Pasquale Vescio ("Mr.Vescio") was forty-six years old in 1991 and had been in business, including the retail business, for about twenty-five years. He attended high school in Brattleboro Vermont. He holds an undergraduate degree in sociology from the University of Miami and worked toward a graduate degree in international administration. He worked in India on development programs for community water systems and construction of buildings for an international relief organization called Care, Inc. When he returned from India in the early 1980s, he took up residence in Brattleboro.

2. Vatsala Vescio ("Mrs.Vescio") has an MBA in Market Research from Delhi University in India. Mrs. Vescio actively participated in both the Phase I and Phase II projects. All loans made by TMB to the Vescios related to the grocery store were made to both Mrs. and Mr. Vescio jointly and personally. Mrs. Vescio also participated in paying many of the Vescios' obligations arising out of the projects.

3. The Vescios have extensive business experience in the Brattleboro community. They have operated a successful and profitable retail business in Brattleboro, which they sold prior to their proposal for Phase II. They have experience in real estate development, having purchased and converted a downtown church to retail spaces. That building was also sold at a profit.

4. "Brattleboro West" is the name of the parcel of real estate that the Vescios developed along Route 9 in Brattleboro, Vermont On the 4.5 acres that they bought in 1984, the Vescios erected a 32,000 square foot commercial building which came to be known as "Phase I" of Brattleboro West. In 1986, the Vescios purchased 2.8 acres of undeveloped land adjacent to Phase I which came to be known as Phase II of Brattleboro West.

5. West Brattleboro Hardware Store ("the Hardware Store") was operated as

part of the Phase I project. Initially, the Hardware Store was owned and operated by Alan Fitch ("Fitch"). Eventually, the Vescios took over operation of the store, with financing provided by TMB. The Vescios ultimately closed the Hardware Store on or about September 26, 1994, leaving TMB with an unpaid balance of $235,000.

6. "West Brattleboro Supermarket" or "West Brattleboro IGA" are names under which the Vescios financed, built and operated their grocery store business in Phase II. For this purpose, the Vescios borrowed $1.6 million from TMB between July 1993 and May 1994.

7. TMB is a federally chartered bank, with offices throughout the State of Vermont. Dudley Davis ("Davis") was President of TMB for all relevant periods until October 1994, at which time he was succeeded by Joseph Boutin ("Boutin").

8. The Vescios dealt with a number of TMB employees during the course of their relationship with the Bank. Daniel Yates ("Yates") was the Bank employee who was most directly involved with the inception and initial administration of the Vescio loans. Yates has been in the banking business since 1975, commencing his employment with TMB in May 1990. He left the Bank in 1994 for another job in the banking industry. At TMB, Yates was directly supervised by William MacKinnon ("MacKinnon").

9. In October 1994, George Cooke ("Cooke") (who the Bank hired in August 1994 as a workout officer) took over responsibility for the Vescio file. Cooke sought to negotiate a workout of the Vescio loans after they went into default. He was employed as a Vice President of the Bank although the Board did not confirm his position as Vice President until later in his service. Walt Greiner ("Greiner") headed TMB's workout department from approximately February 1994 until January 1995. Michael Tuttle ("Tuttle") became Executive Vice President and Chief Operating Officer of the Bank in February 1995, at which time he took over the head of the Bank's workout department, succeeding Greiner.

10. The Vescios and TMB have been represented professionally by a number of persons who became witnesses in this case. The Vescios hired Attorneys Lawren Crispe ("Crispe") in regard to real estate matters and William McCarty ("McCarty") and Robert Evans ("Evans") to handle disputes regarding their obligations to TMB. The Vescios also engaged Donald Todrin ("Todrin") of The Workout Group, a Northampton, Massachusetts specialist in loan workouts, to represent them in negotiations with RECOLL Management Corp. ("RECOLL") and TMB. TMB was represented by Attorney Mark Zwicker ("Zwicker") in its initial dealings with the Vescios and subsequently Gail Westgate ("Westgate"), who began representing TMB around November 1994.

11. The Vescios negotiated with or employed a number of private entities during the course of their Phase II projects. First, the Vescios negotiated with Wetterau, Inc. ("Wetterau"), a Minneapolis-based corporation that operates and supplies grocery stores, to lease primary space in Phase II. Eventually, the Vescios contracted with Bozzuto's, Inc. ("Bozzuto's") to supply the grocery store. Bozzuto's is a food wholesaler, servicing and operating stores in a five-state area, including Vermont. Eventually, its subsidiary, Brat–Marl, Inc. ("Brat–Marl") operated the grocery store under lease from the Vescios until it closed the store on or about October 7, 1997. Robert Wood ("Wood") was Vice President of Bozzuto's and Brat–Marl and had been employed by Bozzuto's since 1973.

12. The Vescios employed Brickstone Masons, Inc. ("Brickstone") as general contractor for the Phase II project. Charles Phippard ("Phippard") was President and co-owner of Brickstone at all times relevant to this action. The Vescios also engaged various subcontractors for construction of the grocery store, including Ken's Refrigeration, which provided the Vescios with equipment and standby credit.

13. The Vescios obtained financing for Phase I and II from a number of banks over the course of the projects. Fleet Bank ("Fleet") and its predecessor the Bank of New England ("BNE") held a first mortgage on Phase I until it sold the Vescio loans to the Federal Deposit Insurance Company ("FDIC") in March 1994. The First National Bank of Vermont ("FNBV") (and its predecessor the First National Bank ("FNB")) held a $480,000 first mortgage on Phase II until FNBV was taken over by the FDIC in the spring of 1993, at which point the FDIC succeeded to the rights of FNBV The United States Small Business Administration ("SBA") agreed to guarantee a portion of the Phase II construction loan up to the maximum of $750,000. Valerie Rogers Morse ("Morse") was at all relevant times chief of the Finance Division of the SBA in Montpelier, Vermont and provided supervision and second signature authority for the SBA's review of the Vescios' application for the guarantee. Bernard Villemaire ("Villemaire") was the SBA loan officer who processed the Vescios' application. Finally, the Town of Brattleboro Small Business Assistance Program ("SBAP") ultimately provided the Vescios $40,000 in financial assistance for Phase II.

## B. Description of Phase I

The Vescios purchased 4.5 acres in West Brattleboro, Vermont in 1984 where they constructed a 32,000 square foot building. The original plan was for the building to house retail stores. The Vescios financed their development of Phase I through a commercial real estate loan in the amount of $1,900,000 acquired from BNE on March 8, 1989. Repayment of the note executed in return for that loan was secured by a first mortgage on Phase I. BNE was then taken over by Fleet. Eventually, due to the failure of Fleet, RECOLL succeeded to the first-priority rights regarding the Phase I property. The Vescios granted a second-position mortgage to the FNB which was subordinated to TMB in 1993.

The Vescios leased a portion of Phase I to Fitch for the hardware store which Fitch operated from 1987 to 1991. The hardware store catered to contractors as well as retail customers. Fitch had a loan with TMB secured by the equipment and inventory within the store. Fitch testified that the store was not profitable because of the Vescios' failure to bring in new tenants and the high rental cost. Fitch decided to terminate his hardware store business in 1991.

## C. Other Secured and Unsecured Loans from 1989 to 1992.

The Vescios took out a number of secured and unsecured loans from TMB between 1989 and 1992 unrelated to the Phase II projects. On October 28, 1989, the Vescios borrowed $36,066 from TMB on an unsecured basis for consolidation of various business obligations. The loan was modified on December 15, 1989, to fix its interest rate at 13.5% and extend its term by two years, from November 15, 1989 to November 15, 1991. This was the Bank's first consolidation loan and was given to the Vescios prior to Yates' employment.

Yates began employment with TMB in May 1990. He first met Mr. Vescio at a Christmas party that year. Soon thereafter Mr. Vescio sought short-term financing for Bocce Restaurant in the amount of $20,000. Yates agreed to lend that amount for six months, during which time the Bank required payments of interest only. Yates extended that loan in the fall of 1991 and granted the Vescios an additional loan in excess of $20,000. In April 1991, Yates extended the Vescios' consolidated loan for an additional two years, thereby reducing their monthly payments.

One such loan was for the purchase of inventory and equipment relating to the hardware store. Fitch turned the keys over to the Bank, voluntarily initiating a repossession of the Bank's collateral. Mr. Vescio became interested in taking over the hardware store. He operated the store with Fitch for a couple of weeks and contacted Emery Waterhouse, a large hardware wholesaler. Mr. Vescio was enthusiastic about the potential for the store as a trustworthy hardware store which catered to the general public.

In the spring of 1991, Mr. Vescio approached Yates seeking loan in the amount of $115,000 for the financial takeover of the hardware store. Fitch testified that the collateral was worth $125,000 to $135,000, since all of the inventory was new and sellable. The Vescios offered the Bank $75,000 for the collateral. Through Yates, TMB agreed to Mr. Vescio's proposal by (1) applying $75,000 of the loan proceeds to purchase the Building Center assets, which were TMB's collateral for a loan the Building Center had not repaid, and (2) advancing $40,000 to fund the Vescios' startup costs. This hardware store loan was secured by a junior mortgage on Phase I and by miscellaneous personal collateral of the Vescios. The documentation for this loan contained a cross-default provision with the other outstanding loans.

Yates knew at the time of the sale of the assets that the book value of the collateral was $150,000 and that the liquidation value was $30,000. He did not disclose the auction value, believing it to be confidential bank information. The Vescios did not disclose Fitch's evaluation of the property as between $125,000 and $135,000. No industry standard exists by which bank officers must disclose liquidation values of property which they intend to sell.

On or about December 6, 1991, the Vescios' loans were consolidated under a single promissory note in the amount of $202,500. The Bank carried this credit as Loan Number 0711 (or "the Second Consolidation Loan"). The promissory note executed in connection with the Second Consolidation Loan had a cross-default provision, so that the Vescios would be in default on this note for failure to perform any other obligations under any other note. Security for this consolidation note included a senior security interest in personal property collateral and a junior mortgage interest in Phase I. Importantly, there was a conditional assignment to TMB of all rents or profits from Phase I as follows:

> As additional security hereunder, BORROWER hereby assigns to LENDER the rents of the Property and all profits derived from any and all uses of the Property, including but not limited to, those derived from business or businesses conducted thereon, provided that BORROWER shall, prior to acceleration...or abandonment of the Property, have the right to collect and retain such rents and profits as they become due and payable.

Trial Ex. 513. By February 1, 1993, the Second Consolidation Loan was modified twice and consolidated with another loan in the amount of $34,000. TMB reduced the

interest rate on these loans from 13.5% to 8.75% and extended the maturity date from 1992 to 1999 at the urging of Mr. Vescio. The final consolidation loan document had a cross-default provision and again was secured by third-priority mortgage on Phase I that continued to include the assignment of rents provision. The Note was also secured by the Vescios' "Miscellaneous Personal Property Collateral." Yates accepted Mr. Vescio's proposal for this consolidation to benefit the Vescios in managing their financial affairs.

By mid-August 1994, the Vescios stopped making payments on the consolidated loan, leaving an unpaid balance of $210,818.

### D. Description of Phase II

Phase II is a 2.8-acre parcel of real estate adjacent to Phase I. The West Brattleboro Supermarket or IGA was located within Phase II. Initially, the Vescios funded their purchase of Phase II real estate with a $460,000 loan from FNB, predecessor in interest to FNBV. This loan was secured by a first position mortgage on Phase II and the second position mortgage on Phase I The Vescios also borrowed an additional $49,000 from FNB for use in connection with Bocce Restaurant. That loan had an SBA guarantee.

### E. Wetterau Project

In September 1991, Mr. Vescio approached Wetterau's Director of Store Development Robert Caldwell, seeking Wetterau's assistance in developing a grocery store for Phase II. After conducting a market analysis, Wetterau agreed to proceed with the project conditioned upon an experienced supermarket retailer operating the business. Wetterau specifically rejected Mr. Vescio's proposal that he operate the grocery store in light of the complexity of the project. Mr. Vescio approached Yates for TMB funding, arguing that a supermarket was needed on the western side of Brattleboro. Yates did not become involved in discussions with Wetterau but agreed that the project was viable.

TMB agreed to lend $1,500,000 in its "First Loan Commitment Letter," which was dated December 20, 1991. TMB's offer to finance the construction of the grocery store project was conditioned upon "receipt by the Bank of a final lease, executed by Wetterau, Incorporated amongst others, that is satisfactory to the Bank." Trial Ex. 516. Yates' decision to finance the project was based upon Wetterau's strong history of earnings which he viewed as virtually guaranteeing that the loan would be repaid. The Vescios were also required to make a collateral assignment of leases and rents as conditions to the financing.

The First Loan Commitment Letter never took effect. Wetterau withdrew from the Phase II development project in January 1993, although Mr. Vescio told Yates that Wetterau had withdrawn from the project the previous spring.

The Vescios allege that they informed TMB of their desire to terminate the grocery store project upon Wetterau's withdrawal and that the Bank persuaded them to continue with the project. The Vescios assert that they reluctantly agreed to continue with the project because of assurances made by Yates that the project remained viable. They had previously put Phase I and II on the market in June 1992, but had received no offers.

The Vescios' assertions that they wished to terminate the Phase II project are not credible. Yates testified that Mr. Vescio proposed that they continue with their development plans without Wetterau. There are no contemporaneous documents other than the listings with a real estate broker

that support the Vescios' claim that they wished to terminate the project. Further, there is no evidence other than Mr. Vescio's testimony that he informed Yates of the Vescios' outstanding tax obligations of $55,000. Both Mr. and Mrs. Vescio testified that they expected to profit from the project. Mr. Vescio was clearly emotionally and financially invested in the project and there is no evidence that he continued with it as a result of coercion or even on the suggestion of anyone at the Bank.

### F. Financing of Phase II

Even prior to Wetterau's formal withdrawal from the Phase I project, Mr. Vescio proposed to Yates that the project go forward with TMB funding and that the Vescios would operate the supermarket. He made this proposal soon after Wetterau rejected the Vescios' suggestion that they operate the store but before Wetterau terminated negotiations. Mr. Vescio sought alternative funding as early as June 1992, due in part to Wetterau's rejection. Yates' initial response was that he "would consider that, but that any financing for such a thing would then require some type of enhancement, such as an SBA guarantee." Trial Tr. at 4279. That position was consistent with the Bank's policy not to extend loan maturity dates beyond five years without SBA involvement. The Vescios had always sought terms of financing which extended well beyond five years. Yates did not encourage the Vescios to continue with the project after Wetterau withdrew nor did he suggest that their proposal would necessarily proceed even if Wetterau were to drop out of the deal. *See id.* at 4278.

In a letter to Yates, Mr. Vescio proposed that they apply for conventional SBA or Farmers Home loans which offered the best interest rates. The Vescios then actively pursued an SBA guarantee for their loan. Through Yates, they applied for an SBA guarantee for a $1,400,000 loan from the Bank from which funds $480,000 was to be paid to FNBV to retire its first mortgage and the rest was to finance construction of the grocery store.

The SBA has three lending programs. The Preferred Lenders Program ("PLP") is available to selected applicants with strong credit histories. The SBA approves PLP applications without reviewing any documentation. Under the Certified Lenders Program ("CLP"), the SBA conducts a minimal review of the paperwork, but generally accepts the findings of the lending institution. Under the 7A Program, the SBA conducts a full work-up of the proposal as if it was underwriting the debt. The SBA's review of 7A applications, however, does not usually take a particularly long time.

Yates submitted the Vescio proposal to the SBA under its 7a Program. The Vescios claim, however, that Yates *told* them that he was submitting their application under PLP; Yates, on the other hand, denies having made such a statement. Because the Vescios' poor credit history would have made it imprudent for Yates to submit their application under PLP, and because the Court cannot see what motive Yates could have had for lying to the Vescios about this, the Court does not find credible the Vescios' claim that Yates misled them about the program under which he submitted their application. In any event, however, the dispute about which program Yates told them he used is immaterial, since the SBA ultimately accepted the proposal, and the level of scrutiny the SBA gave the guarantee application had only minimal impact on the amount of time it took the Vescios to get the SBA approval.

Initially, the SBA rejected the Vescios' proposal due to the Vescios' insufficient

"equity injection" into the project. The Vescios then sought to borrow $160,000, secured by a mortgage on their home, proffered standby agreements with the contractors by which the contractors deferred payment, and sought to reduce the buyout figure from FNBV. FNBV agreed to accept $350,000 to subordinate their loan. The Vescios then sought a loan from TMB for $350,000 to accomplish this subordination.

The Vescios also sought $100,000 from the Town of Brattleboro's SBAP before the Board of Selectmen ("the Board") on September 28, 1992. The Board rejected the proposal, informing the Vescios that it could not approve their request while they were $55,000 behind on paying their property taxes. Mr. Vescio assured the SBA that he would reapply in the near future; however, he did not in fact submit a new application until May 1993. In the May 1993 application to SBAP, the Vescios sought $40,000. The Board granted his application in July 1993.

The SBA proposed that the Vescios contribute $300,000 in cash equity, that TMB lend the Vescios $350,000 to subordinate FNBV's position and lend them $1,050,000 for development with an SBA guarantee. The Vescios responded to the SBA's proposal by suggesting new terms, including that $301,000 go to FNBV and $49,000 to pay off the SBA-guaranteed loan for the Bocce Restaurant. There is no evidence that this provision was ever agreed to by either FNBV or the SBA. Because the Vescios made a counteroffer rather than accepting the terms proposed by the SBA at this point there was no agreement between the parties with respect to financing for the construction of the grocery store.

The SBA notified the Vescios that their application would be processed when the Vescios' plans for inventory financing were finalized. At that time, however, there were no such plans.

In November 1992, TMB President Davis approved the structure of the SBA proposal, authorizing Yates to make (1) a Home Line Loan in the amount of $160,000, (2) a subordination loan in the amount of $350,000 without an SBA guarantee, and (3) a Development Loan in the amount of $950,000, with or without SBA guarantee as Yates "considered to be in the best interests of the Bank with respect to this transaction." Trial Tr. at 194. Thus Yates had the discretion to approve the Development Loan even if the SBA did not provide a guarantee.[1]

TMB made a written offer dated December 1, 1992 (the "Second Loan Commitment Letter") to lend the Vescios $350,000 to fund the subordination loan and $950,000 to fund the store development loan. The offer was conditioned, however, upon the Vescios obtaining an SBA guarantee for the $950,000 loan. The loans would be secured by a first-position mortgage on Phase II, first position security interests in substantially all of the Vescios' personal property assets (with the exception of Bozzuto's interest in collateral not to exceed $75,000), and a collateral assignment of leases and rentals. The commitment letter was not to be effective unless accepted within 90 days. In a letter dated December 2, 1992, TMB also offered to make a Home Line Loan to the Vescios in the amount of $160,000. The Vescios accepted the Home Line Loan offer on January 11, 1993. The Vescios did not sign the Second Loan Commitment Letter, however, until February 16, 1993, and did not deliver the letter to the Bank until March.

The Vescios' failure to return the Second Loan Commitment Letter until March

---

1. Yates and Davis were not aware of the Vesc- ios' real estate tax arrearage at that time.

was just one of many reasons for the delay in scheduling the closing of the loan. The Vescios undertook the responsibility of arranging for the SBA guarantee and subordination of the FNBV security interest in Phase I. The SBA rejected the Vescios' application in January 1993 because of the insufficiency of owner equity in the project and the Vescios' poor credit history. The Vescios met with SBA officers who suggested that the Vescios would be able to obtain SBA approval if they decreased the loan amount to $1,050,000. On behalf of the Vescios, Yates proposed a reduction of the construction loan from $950,000 to $750,000, thereby reducing the money the Vescios sought to borrow to $1,100,000. On February 17, 1993, the SBA agreed to guarantee the loan, offering an "Authorization and Loan Agreement" on a standard SBA form, subject to numerous conditions regarding funding. Among those conditions were that the Vescios inject $214,000 cash equity into the project and that they establish standby agreements worth $195,000. The SBA Agreement modified the Bank's Second Loan Commitment Letter by reducing the construction loan to $780,000. The Vescios waited until May 8, 1993 to execute the SBA Agreement.

In April 1993, Mr. Vescio notified Yates that the FDIC would not accept $350,000 to subordinate its position on the FNBV first mortgage, but demanded an additional $100,000. In fact, the FDIC had never agreed to accept the $350,000 figure and there is no evidence that the alleged loan processing delay by TMB had any impact upon the FDIC's increased demand of an additional $100,000. Mr. Vescio requested that TMB loan the Vescios an additional $100,000 to accomplish this subordination. In May 1993, the FDIC agreed to accept $425,000, thereby reducing the Vescios' subordination deficit to $75,000. The Vescios accepted this proposal. As a result, since the Vescios had raised no cash equity over and above the $160,000 Home Line Loan, they were short the $75,000 they needed to eliminate the subordination debt and the $54,000 needed to meet the SBA's $214,000 cash equity requirement.

During the period between execution of the commitment letter and closing, the Vescios continued to attempt to change the nature of the arrangement with TMB. They sought to extend the term of the note from fifteen to twenty years with a reduced fixed interest rate. They also sought to substitute Sweet Life corporation for Bozzuto's, which required a change in the SBA agreement. They then changed the proposal back to Bozzuto's. They also had no approval on their SBAP application until July. Moreover, they did not have construction or even design plans for the project prior to July.

In short, the reason that the parties could not proceed to closing until July 1993 was that all of the details of the agreement were not resolved until that time.

### G. TMB representations

The parties engaged in numerous discussions about tentative closing dates. The Court does not find credible the Vescios' claim that Yates told them in June or July 1992 that the closing would take place within "10 or 14 days" or "within a few days." At that time, the Vescios had just informed Yates that Wetterau withdrew from the project. Wetterau was a necessary partner to the project since the loan was conditioned upon its participation. Essentially, Wetterau's withdrawal completely changed the nature of the project, and it is inconceivable that Yates would have so easily agreed to the removal of that crucial condition and promise the Vescios such a prompt closing. Yates in fact testified at trial that he made no such statement and that he did not even have

the authority to remove the condition of Wetterau's participation without TMB's approval. There are also no documents which confirm Mr. Vescio's testimony that Yates made such representations. To the contrary, Mr. Vescio informed Yates that they would apply for construction financing through conventional lending institutions, SBA or Farmers Home so that they could get the best possible rate.

The Vescios also assert that Yates falsely informed them that the SBA was running out of funds in December 1992 as an excuse to delay the closing. The SBA's Valerie Morse, however, testified that the SBA did indeed run out of funding in December 1992.

## H. July 19, 1993 Closing

TMB proceeded to close on the initial Grocery Store Loans and the Home Line Loan on July 19, 1993. In addition, Yates permitted the Vescios to apply $75,000 of the construction loan toward the subordination deficit. The Vescios executed two promissory notes in exchange for the grocery store development loan in the amount of $605,000 on July 19, 1993, which was increased to $780,000 on January 19, 1994. That increase was intended to cover additional advances that the Bank made to the Vescios. The Vescios granted to TMB a first-position mortgage of Phase II, including an assignment of rents and profits for all monies payable to the Vescios under any Phase II lease. The Vescios also granted TMB security interests in:

a. All equipment, and machinery, including power-driven machinery and equipment, furniture and fixtures and leasehold improvements now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, accessions, parts and tools belonging thereto or for use in connection therewith;

b. All inventory, raw materials, work in process and supplies now owned or hereinafter acquired;

c. All accounts receivable now outstanding or hereafter arising; and

d. All contract rights and general intangibles now in force or hereafter acquired.

Trial Tr. at 519. The security agreement was written on an SBA form, since Yates thought it necessary to use such forms to document SBA-guaranteed loans.

Soon after execution of the promissory note, Mr. Vescio notified the FDIC that the Vescios' position was "untenable" because the proceeds of their $160,000 Home Line Loan and the additional SBAP loan of $40,000 had been used for other expenses The FDIC refused the Vescios' request to defer payments on the note until the store opened.

TMB paid $425,000 to the FDIC on behalf of the Vescios, as contemplated by the FDIC subordination agreement. This payment included $75,000 from the proceeds of the initial grocery store development loan. In other words, the Vescios used funds which had been reserved for construction of the grocery store to eliminate their subordination deficit. Moreover, the Vescios promised to replace these funds.

In fact, the Vescios used the construction loan for payment of a number of obligations unrelated to the construction project Mrs. Vescio was primarily responsible for payments from the construction loan. With few exceptions, she had discretion to choose how those funds were used. With the Vescios' knowledge and consent, the construction loan was used to make interest payments toward the consolidated loans the Vescios owed to TMB. Mrs. Vescio also used the construction loan funds to pay delinquent property taxes and other

personal expenses, including university tuition payments for one of the Vescios' children. She insisted that payments be made to the FDIC from the construction funds. For the most part, the Vescios had control over the construction loan funds, and at the very least, never objected to the use of those funds to keep their other loans current. In light of the cross-default provisions of the construction loans, such use of the funds was entirely appropriate.

In September 1993, Bozzuto's agreed to make a $200,000 inventory loan to the Vescios in return for a first-position security interest in all of the grocery store inventory. This agreement subordinates TMB's security interest in inventory to Bozzuto's even though the Bank's loan commitment letter only permitted the Vescios to grant Bozzuto's a first-position security interest in inventory for an amount not to exceed $75,000. TMB took no part in the execution of the $200,000 subordination agreement. In fact, there is no credible evidence that Yates even knew of the $200,000 subordination agreement.

## I. Construction delays

The Vescios complain that construction of the grocery store was delayed because the Bank withheld its approval of the application until July 1993. In fact, however, numerous factors contributed to the thirteen month delay, most of which were within the control of the Vescios. One of those factors was the Vescios' inability to meet the cash equity standards for SBA approval. Moreover, the Vescios took on the responsibility of negotiating with the SBA regarding its requirements. The SBA made clear that the Vescios were

required to provide $214,000 in cash equity for the project. The Vescios made little effort to find funding from other investors for such cash equity other that contacting a relative. Further, the size and cost of the project was constantly changing during this period. Ultimately, the Vescios agreed to reduce the proposed construction loan from $950,000 to $750,000 and provide $160,000 through the Home Line Loan and standby agreements with contractors to satisfy the SBA' requirements. They also had failed to get the FDIC's agreement to subordinate FNBV's security interest, which had to be resolve prior to the Bank agreeing to close on the loan. Finally, there has been no showing that the delay in closing harmed the Vescios in any way, since they were unprepared to proceed with construction of the building at that time.

The Vescios also complain that post-closing delays in the construction of the grocery store were caused by the Bank's negligence. However, the Vescios did not have foundation or shell plans until January 1994. They selected and supervised the various contractors and subcontractors on the project, about who they also had numerous complaints.[2] Mr. Vescio admitted that the general contractor Brickstone, the electrical contractor Tyler, and the equipment packager Northeast Store Development were responsible for delays in completing the project. These dispute between Mr. Vescio and the contractors and subcontractors ended in litigation involving claims by Mr. Vescio that the negligence of those parties contributed to delays and lost profits, the same lost profits for which the

---

**2.** In a letter to Yates, for example, Mr. Vescio complained that "Brickstone abandoned us in early June ... and failed to properly supervise one of the key subcontractors, causing serious delays.... Brickstone Masons failed miserably." Letter from Mr. Vescio to Yates of 7/11/94. Mr. Vescio also stated: "had I not gotten directly involved in the CVPS, I feel that we would not have had heat, and been closed in, for several days." Letter from Mr. Vescio to Phippard of 3/4/94.

Vescios seek relief in this lawsuit. Moreover, the frequent change orders mandated by the Vescios during construction further contributed to delays in completion. According to Mr. Phippard, those orders added costs of over $100,000. Those changes were ordered by Mr. Vescio and not TMB. There is no evidence that any of the Bank's post-closing acts contributed to further delays in the construction project.

## J. Supplemental Grocery Store Loans

The Vescios requested a number of supplemental construction loans from TMB, beginning with one in January 1994 for an additional $170,000. The building had been closed in by February 1994. These additional funds were supposed to cover increased costs due to delays and change orders. According to Brickstone, Mr. Vescio was in charge of the project and his change orders resulted in costs in excess of $109,000. Based upon the Vescios representations that $170,000 was needed to complete the store and that this additional debt could be handled easily, Yates agreed to loan the Vescios an additional $170,000.

In May 1994, Yates helped the Vescios to obtain an additional $300,000 loan for development of the store. The loan was secured by all of the business assets of West Brattleboro IGA, including fixtures, equipment, and inventory. The Vescios never told Yates that NSC Corporation, see discussion infra Part K, would be the owners of the Phase II equipment. Including this last additional loan of $300,000, the total amount that TMB loaned to the Vescios in construction funds was $1,250,000.

The $300,000 note and security agreement was executed in May 1994. An initial security agreement which covered these assets had been a part of the original loan signed in July 1993, supported by a security agreement written on an SBA form. In May 1994, TMB notified Yates that he should not have used an SBA document until the SBA-guaranteed loan actually closed. Trial Tr. at 4361. Yates then directed his assistant Gay Young to get a new non-SBA Security Agreement signed, post-dating the document to July 19, 1993, to replace the SBA form. Young had the Vescio sign a document that contained this error. Yates then directed Young to backdate the security agreement on the non-SBA form to correct the mistake. He never compared the SBA form to the non-SBA form, however, to determine which was preferable from the Bank's perspective.

The second security agreement was never used in litigation. Cooke found the agreement while reviewing the file. Yates testified at trial (and told Cooke earlier) that his intention in preparing the second security agreement was to re-document the loan without using the SBA form. The initial SBA security agreement dated July 19, 1993, covered after-acquired property as well as future advances made by TMB to the Vescios. There was no evidence that creditors filed liens against the Vescios or their property between July 19, 1993, when the Vescios signed the SBA security agreement and May 1994, when the Vescios signed the second (non-SBA) security agreement.

## K. NSC Corporation

Prior to May 1994, Mr. Vescio told Yates that he created a corporation called NSC Corporation to be a shell for the purpose of limiting personal liability for liquor or personal injury at the store. Trial Tr. at 4356. Mr. Vescio testified in deposition that NSC Corporation was not meant to hold assets. Moreover, it is clear that the Vescios never informed Yates or any other TMB employee that NSC Corporation

would be the owner of any of the Bank's personal property collateral.

On May 10, 1994, Mr. Vescio sent a note to Yates stating that Bozzuto's had asked him to sign a UCC–1 form. That form purported to give notice of a security interest in favor of Bozzuto's in equipment, fixtures and inventory of the store. However, although Bozzuto's was identified as the secured party, the space for debtors was left blank. The Vescios had always listed themselves as debtors, and if they had done so on this UCC form, the Bank's security interest in the collateral would have been preserved. Mr. Vescio told Yates that he had informed Bozzuto's that other parties would be in priority positions regarding their security interest in these properties. Yates gave Mr. Vescio permission to sign the UCC. Thereafter, however Mr. Vescio wrote NSC Corporation in as the debtor on the form. Then, after TMB advanced the additional $300,000 to the Vescios, they purchased inventory and equipment through NSC Corporation, thereby arguably depriving TMB of its security interest in the collateral. Yates testified that Mr. Vescio's conduct in designating NSC Corporation as the holder of the collateral constituted fraud.

The Bank's fraud claim was grounded in the language of the July 1993 SBA Security Agreement executed by the Vescios in connection with the original construction loans. The security agreement provides that:

debtor shall not transfer, sell, or assign debtor's interest in the collateral, nor permit any other security interest to be created without secured party's prior written approval, except debtor may sell the inventory ... in the ordinary course of business under customary terms and at usual prices and may collect as secured party's agents sums due on accounts receivable and contract rights

listed in paragraphs 2D and 2E ... until advised otherwise by secured party.

Trial Ex. 153. Under this agreement therefore, the Vescios agreed not to compromise or subordinate TMB's interest in the collateral.

The Vescios had given the Bank a security interest in the grocery store's fixtures, equipment and inventory. Assignment of that security interest without the Bank's approval is a breach of the security agreement. If that breach was done knowingly and deceptively, it was fraudulent. The Bank therefore had legitimate grounds for filing a fraud claim against the Vescios when it foreclosed on Phase II in February 1994.

Prior to filing the fraud claim in the foreclosure action, however, TMB repeatedly requested that the Vescios explain the role of NSC Corporation, through letters and oral requests to Attorney Evans from Attorneys Zwicker and Westgate. The Vescios denied that NSC Corporation held title to any property but failed to explain the history of the transaction by which Bozzuto's received a security interest in the collateral.

When Cooke learned that Vescios had surrendered the grocery store and its assets to Bozzuto's, he sent emails on October 11 and 20, 1994, to Greiner and MacKinnon about his concerns over the Bank's security position in the collateral. He also expressed concern over the Vescios declaring bankruptcy.

TMB and Bozzuto's engaged in extensive negotiations over their respective security interests in the collateral of the store, including the fixtures, equipment and inventory. Bozzuto's took the position that they obtained the collateral from NSC corporation, so that TMB no longer had an interest in the collateral. Eventually, their dispute was resolved when Bozzuto's

paid $300,000 plus interest to the Bank for the release of the Bank's interest in the collateral. As part of this resolution, Bozzuto's gave up its demand for a non-disturbance agreement.

### L. Operation of the Grocery Store

The Vescios opened the grocery store on June 22, 1994. The then operated it for slightly more than three months before surrendering it to Bozzuto's on October 7, 1994. The Vescios employed a full-time store manager during this three month period and did not receive a salary.

Bozzuto's has extensive experience in the operation of supermarkets. They service 1,450 supermarkets and have seven retail stores. In addition to expertise, Bozzuto's contributed extra advertising dollars and inventory. Bozzuto's also employed the same manager, Lois Leitch, and the same department heads as had been employed by the Vescios. Bozzuto's sales mix among its products at the store was virtually identical to the Vescios. Despite its level of experience and funding, however, Bozzuto's Chief Financial Officer Robert Wood testified that the store was never profitable during its three years of operation. In its first year of operation, Bozzuto's broke even. It lost $72,000 in its second year of operation and $308,000 in the third year. In the first year the store averaged $93,000 per week, but those sales slid to $79,000 per week in the second year and $63,000 in the third. After three years of failure, Bozzuto's closed the store despite its continuing obligation to make rental payments.

A number of factors contributed to the decline in business and the resulting losses, which began during the very first week of operation. The central factor in that decline was the dramatic increase in competition in 1995 and 1996, during which time a number of Brattleboro supermarkets were constructed or grew in size. For example, Grand Union enlarged its store to 75,000 square feet. Price Chopper grew from 15,000 square feet to 45,000 square feet. A Hannafords store was built in 1996. Finally, the Wal–Mart store located in the Brattleboro vicinity increased dramatically their sales of groceries. At the same time, from 1990 to 1995, Vermont median household income dropped from $36,261 to $33,824. The population of Brattleboro also declined from 1993 to 1995.

According to the Vescios' projections, sales of $110,000 per week would have been required for the store to remain solvent. During the first five weeks after the opening of the store (ending on August 6), the average sales were $127,000. For the next four weeks (ending on September 3), the sales fell to $114,000, and for the four weeks ending on October 1, the average sales were $107,000.

### M. Work-out Negotiations

In August 1994, the Vescios were in default on their loan obligations to TMB. By October 1994, they had stopped making payments to RECOLL, the first mortgage holder on Phase I, and they had stopped paying property taxes. At that time, the Vescios were living off of the Phase I rents.

Workout negotiations began in the fall of 1994. Cooke took over responsibility for the loans on behalf of TMB in September 1994. At the same time, the Vescios hired Attorneys William McCarty and Robert Evans to represent them with respect to their relationship with TMB. The Vescios also hired Donald Todrin of The Workout Group in August to help them to either restructure their obligations with the Bank or arrange for alternative financing for the project. The Vescios relied primarily on

Todrin's assistance during the workout period.

Greiner, who was Cooke's supervisor during the workout negotiations, had investigated Cooke's background prior to his employment and found him to be competent and professional. Greiner never heard of any complaints about Cooke's conduct during negotiations with the Vescios. He and others, including Michael Tuttle, were aware of the status of the proposals and provided appropriate supervision according to standard Vermont banking practices.

Cooke met with the Vescios three or four times from mid-September to October 7, 1994. He also met with the Vescios on one occasion in 1995. Cooke also communicated extensively with Todrin and Evans during this period.

Cooke's first meeting with the Vescios occurred on September 16, 1994. He attended the meeting at Yates' urging, knowing that the Vescios had complained about the Bank's, and in particular, Yates' acts during the course of the lending relationship. Although Cooke had not completely reviewed the Vescio file prior to that first meeting, he was aware that the Vescios were delinquent in their payments. During the first meeting, the Vescios did not complain about anyone's conduct at TMB. Rather, they sought to obtain additional financing in the amount of $200,000 to prevent Bozzuto's from taking over the grocery store The Vescios also sought to refinance their loans at a fixed rate of interest at 7% or 8% over 15–20 years. Cooke refused to grant their request regarding the interest rate changes but did not respond to the request for an additional $200,000. Instead, he asked for additional financial information, including updated monthly financial statements. The Vescios forwarded to him inadequate financial information, which did not include monthly financial statements.

On September 23, 1994, Cooke met with the Vescios and representatives of Bozzuto's at the grocery store. A tentative agreement was reached whereby Bozzuto's would pay $360,000 for the equipment and fixtures. There were a number of issues not resolved by this tentative arrangement, however, including issue regarding the amortization of the Bank's loan and the non-disturbance provision.

With their attorney, Evans, the Vescios met with Cooke again on October 7, 1994. At that meeting, the Vescios made the following demands: (1) the Bank must refinance the $1.3 million loan at a fixed rate of 8% for 10 years with a 25 year amortization; (2) Bozzuto's would pay $300,000 to settle the equipment loan; (3) the hardware store would be liquidated and any deficiency forgiven; (4) the second mortgage on the Vescios' home would be written at a fixed rate of 8% for 10 years; and (5) the Bank would lend the Vescios an additional $200,000 to be use to pay all construction debts. Evans also threatened suit for the Bank's actions regarding the Vescios' loans and argued that the Bank did not have a security interest in the grocery store collateral because the Vescios had used the money lent them by the Bank to buy equipment in the name of NSC Corporation. Since NSC Corporation was not a party to the original security agreement, TMB had no security interest in the property. Cooke rejected the demands.

The Vescios surrendered the grocery store to Bozzuto's on that same day. The Vescios entered into a long-term lease with Bozzuto's for a fixed rental amount, beginning at $12,500 per month. Bozzuto's and TMB eventually reached agreement regarding the dispute over the Bank's interest in the equipment and the non-distur-

bance provision, whereby Bozzuto's agreed to pay $300,000 for the release of the Bank's interest in the property.

Cooke met with the Vescios in November to discuss NSC Corporation. The Vescios agreed to answer written questions regarding the formation of the corporation. The Vescios charge that Cooke threatened them during the course of negotiations, including threatening to have the FBI come to their door. The Vescios also accuse Cooke of telling them to fire their attorney during the negotiations.

Westgate assumed representation of TMB in late November 1994. She sent a demand letter on December 8, 1994, by which she demanded full payment by December 15, 1994. The December 15 deadline passed without payment. In December, the Vescios liquidated the hardware store without prior notice to the Bank and stated to their advisors that they were keeping the Phase I rents while not making mortgage payments. The Vescios were also in debt for back taxes in the amount of $118,669.

TMB continued to negotiate with the Vescios and their representative over the next few months. The Vescios made numerous workout proposals, reducing the pay off figure from $2 million. Eventually the Bank agreed to a $1 million pay off, provided that there was a drop-dead date to the agreement. The parties discussed a friendly foreclosure, but the Vescios continued to decline the Bank's proposals. Attorney Evans told Westgate that "it would be helpful if the bank commenced foreclosure proceedings against the Vescios in order to move the forward toward a resolution." Trial Tr. at 2858. Westgate notified Evans on January 19, 1995 that TMB was proceeding to foreclosure.

Representatives of the parties met in mid-February 1995. They reached a mutual understanding to resolve the dispute, but the Vescios rejected the proposal.

TMB filed a foreclosure action against the Vescios' commercial properties on February 22, 1995 and against the Vescios' residential property on April 20, 1995. On February 24, 1995, TMB exercised its assignment of rents and gave notice of the exercise of the assignment to Evans on that date. As to Phase I, TMB's rent proceeds were turned over to RECOLL for two months, after which RECOLL sought its own assignment of rents. Bozzuto's rent payments went directly to the Bank. The Vescios objected to the assignment of rents in July and the matter was scheduled for a hearing in January 1996. Meanwhile the Vescios were not impaired in their efforts to defend in the litigation nor to pursue alternative sources of financing.

The parties continued to negotiate even after the filing of the foreclosure action. Attorneys for both sides agreed to suspend discovery while these negotiations continued. On March 8, 1995 Todrin sent a letter to Cooke outlining a deal that he represented the Vescios would accept, which provided for a partial payoff of $1,285,000 and refinancing of $500,000, in part from the Bank via a second mortgage. A closing date was propose for April 30, 1995. Cooke accepted the proposal, but it was subsequently rejected by the Vescios, since they refused to agree to a drop-dead date. Negotiations continued into June, with the Bank eventually reducing its offer to a $1 million payoff figure According to Cooke's notes,

> earlier this week [of June 15] a tentative arrangement was reached; subject to board approval, the Bank will receive approximately One Million Fifty Thousand Dollars in full settlement of its debt; the closing is planned on or before July 28, 1995; releases and appropriate

documentation will be completed at the closing; should the closing occur, neither party is obligated to continue negotiations.

Trial Tr. at 447–448. Because the Vescios again refused to accept a drop-dead date, despite the urging of their representatives, no settlement was ever reached.

Earlier in the negotiations, in a letter dated May 26, 1995. Cooke told Todrin that the Bank management would seek the approval of its Board of Directors for the Vescios' proposal for a cash payment of $1 million. Cooke also said the offer was "woefully inadequate," and that he reserved the right to seek alternate solutions in the meantime. Alternate solutions included the potential sale of the loans. Cooke showed the Vescios' proposal to Tuttle in June 1995 while indicating he would not support the proposal. The workout proposal did not have a definite financing source, nor a drop-dead date, and Tuttle chose not to submit it to the Board. On June 30, 1995, TMB sold the loans to AMRESCO for $889,164.67. The principal balances at the time of the sale were: (1) Loan 1759: $947,428.4 (construction); (2) Loan 115: $345,679.60 (construction); (3) Loan 0644: $7,389.02(automobile consumer); (4) Loan 1271: $159,988.74 (home line); and (5) Loan 0758: $210,818 (final consolidation). TMB's purpose in selling the loans to AMRESCO was to take non-earning assets and get them to perform.

AMRESCO wrote to McCarty in July 1995, proposing to accept the same offer that had been discussed with the Bank prior to the sale of the loans to AMRESCO, namely, a cash payment of $1 million.

The Vescios rejected the offer and returned with an offer of $800,000. That offer was rejected.

During this entire period, TMB was operating under a Memorandum of Understanding with the Federal Reserve arising out of the government's concern regarding a number of management issues in the past. That Memorandum of Understanding represented a mid-level intervention by the Federal Reserve. A more significant intervention would have been accomplished by a cease and desist order. Moreover, on a scale of concern for the health of the institution, TMB was rated at level 4 on a scale of 1 to 5, level 5 representing a failing bank. That assessment was reduced to level 3 in March 1995. Much of the concern stemmed out of a $9 million loss in an investment with Piper Jaffrey, a loss which was reduced to $3 million with a contribution from an insurance company. Most significantly, TMB had sufficient capital capacity and was not suffering from a liquidity crisis, and there was no reasonable concern over its ability to pay its bills.

### III. Conclusions of Law

■ In order to prevail on their claims, the Vescios have the burden of proving damages and that the alleged failures of TMB were the proximate cause of such damages. The Vescios can do neither. "Proximate cause," in contrast with "but-for cause" (also known as "actual cause," "cause in fact," and "factual cause"), is defined as "[a] cause that is legally sufficient to result in liability." Black's Law Dictionary 213 (7th ed.1999).[3] The Court first turns to the question of damages.

---

**3.** As one treatise has aptly explained,
[p]roximate cause'' —in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility

## A. Damages

The Vescios introduced evidence regarding two theories of damages: (1) loss of profits and benefits; and (2) loss of net worth. They also seek punitive damages as well as compensation for the alleged emotional damages associated with some of their claims.

### 1. Lost Profits

■ Under Vermont law, a Plaintiff seeking to recover lost profits must show that his business (1) was a going concern with (2) an established history of profits. *See My Sister's Place v. City of Burlington*, 139 Vt. 602, 613, 433 A.2d 275, 282 (1981) ("expected profits from a new business are too speculative and uncertain to be considered in a damage award"); *Berlin Dev. Corp. v. Vt. Structural Steel Corp.*, 127 Vt. 367, 372, 250 A.2d 189, 193 (1968) ("The general rule is that evidence of expected profits from a new business is too speculative, uncertain, and remote to be considered and does not meet the legal standard of reasonable certainty. Accordingly, recovery for lost profits is not generally allowed for injury to a new business with no history of profits.") (citations omitted).

■ The Vescios cannot possibly satisfy this standard. All of the profits they allege are purely hypothetical or at best highly speculative. In the three months that the Vescios operated the store, there can be little question that they failed to establish a history of profits, as is required under *Berlin*. Moreover, when Bozzuto's took over operation of the store, it suffered enormous losses, undermining any claim that the business "might have" at some point taken off if it were not for the Bank's alleged failures.

Plaintiffs rely upon the expert testimony of James Lurie to support their claim for lost profits and benefits. Lurie applied a theoretical model over a fifteen year period based upon the Robert Morris survey data. He assumed a number of factors as a basis for his model, including a net profit of 1% of sales and sales and profit growth of 3% per year. He also assumed the Vescios' reasonable compensation for operation of the store was $91,000 per year, and that amount would grow at a rate of 3% per year. He concluded the Vescios' lost profits figure was about $160,000 and lost benefits figure was approximately $975,000.

Lurie's assumptions and calculations are simply not borne out by the facts. Most start-up businesses fail, and to assume immediate profits for this new venture makes no sense. His calculations did not consider relevant market factors. In this case, these market factors included increased competition which had a direct impact upon profits. He did not factor into his findings a one to two year ramp-up to potential profitability. Lurie's conclusion that the Vescios should earn $91,000 per year with an annual increase of 3%, did not consider the presence of store manager and the variabilities in profits caused by increased competition. Lurie also did not consider the difficulties created by under-capitalizing the grocery store, a problem which clearly existed in 1994.

upon such a basis would result in infinite liability for all wrongful acts, and would 'set society on edge and fill the courts with endless litigation.' As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundaries must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 264 (5th ed.1984).

The Court finds that the Vescios' grocery store constituted a highly risky business venture. In light of the dramatically increased competition in 1995–96, its chances of becoming profitable were negligible. Plaintiffs therefore have not prove they are entitled to lost profits and benefits.

Furthermore, the Court agrees with the Bank that the Vescio cannot get out from under this rule by labeling their alleged lost profits as "lost wages." Given the Vescios' status as the sole investors and owners of their business, as TMB argues, "[t]he label 'lost wages' is not a proper economic characterization of the claim the Vescios assert." Post–Trial Proposed Conclusions of Law and Mem. of Countercl. Def. The Merchants Bank Concerning Damages at 18 (Bankr.Paper 865) [hereafter "TMB's Proposed Concs. of Law re: Damages"].

### 2. Loss of net worth

■ This claim was not in the Vescios' pleadings and therefore should not even be considered by the Court. However, even if the Vescios had pled this claim, the Court finds that they have not shown any damages stemming from alleged loss of net worth for the simple reason that their assets were worth nothing in mid–1992, when their causes of action allegedly arose. Moreover, the success of the Vescios' argument regarding loss of net worth depends upon a finding that Yates made the statements the Vescio allege, pushing them to go forward with the grocery store project and the loan transaction after Wetterau withdrew. Because the Court finds that Yates made no such statements—rather, it was Mr. Vescio who vigorously pursued the store project after Wetterau's withdrawal—this claim must fail.

Again, the Vescios rely upon the testimony of James Lurie to provide an evidentiary basis for the damages they seek to recover. Lurie testified that the loss of net worth was approximately $525,000 based upon a number of unfounded assumptions. Lurie assumed first that the Vescios would have sold the properties in mid–1992 but for the insistence of TMB that they pursue the Phase II project. He then assumed a values for the three pieces of property based upon appraisals that were never introduced into evidence. Apparently the appraisal on Phase I was dated August 15, 1994. The appraisal on Phase II was undated. Lurie assumed the value of the house to be about $200,000, although he had no basis upon which to do so. He had not done the appraisal himself, nor was he qualified as a real estate expert. Essentially, none of these valuations were properly admitted or proven to be reliable. Moreover, Lurie never considered a number of outstanding debts the Vescios owed which directly impacted their net worth, including the hardware store loan. Conversely, the Vescios' tax returns, which were introduced into evidence, showed a large and increasing negative net worth in their commercial real estate from 1991 through 1995 beginning with a deficit of $763,140 in 1990 and increasing to $1,781,795 in 1995. Trial Tr. at 3946–67.

The Court finds the Vescios failed to introduce competent evidence establishing any net worth in mid–1992. Accordingly, they have not suffered damages from their alleged loss of net worth.

### 3. Emotional damages

The Vescios also seek emotional damages in connection with their claims of tortious interference with contract (count IV); negligence (count VII); and negligent supervision (count VIII). The Vescios cannot recover emotional damages, however.

### a. Negligence claims

■ Under Vermont law, a plaintiff can only recover emotional damages for negligence if (1) he or she was "within the 'zone of danger' and subject to a reasonable fear of immediate personal injury," and (2) the plaintiff's alleged emotional distress is "accompanied by substantial bodily injury or sickness." *Vaillancourt v. Med. Ctr. Hosp.*, 139 Vt. 138, 143, 425 A.2d 92, 95 (1980). The Vescios have made neither of these showings; the did not even allege any sort of physical harm nor any actions by the Bank that might have created a reasonable apprehension of such harm. Nor have they provided evidence that their alleged emotional distress was accompanied by "substantial bodily injury or sickness." Thus, they cannot recover emotional damages for their negligence claims.

### b. Negligent supervision claim

■■ The Vescios also cannot recover emotional damages in connection with their negligent supervision claim because no such damages are available under Vermont law. In *Pearson v. Simmonds Precision Prods., Inc.*, 160 Vt. 168, 624 A.2d 1134 (1993), in which the Vermont Supreme Court reversed a jury award for emotional damages arising out of the defendant's negligence the court reasoned:

> In sum, this was a case in which plaintiff's direct loss resulting from the negligent conduct of the defendant was economic. The consequential injury resulting from economic loss in terms of emotional distress is not compensable. Recovery for worry, distress and unhappiness as the result of . . . loss of a job . . . is not permitted when the defendant's conduct is merely negligent.

*Id.* at 173, 1137 (citation omitted). Under this reasoning, it is clear that the Vescios, too, cannot recover emotional damages in connection with their negligent supervision claim.

### c. Tortious interference with contract claim

■ Nor can the Vescios claim emotional damages with respect to their tortious interference with contract claim. Their only articulated claim in connection with this cause of action was that the Bank exercised its assignment of rents in February 1995 on the Phase I property. This claim fails, however, because the Vescios offered no evidence at trial of any emotional injury resulting from the exercise of the assignment of rents. Moreover, the Vescios specifically disavowed any such evidence a trial.

■ "Emotional distress damages may be available to one who is harmed by tortious interference with contractual relations." *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 271, 583 A.2d 583, 590 (1990). However, a necessary element of such a claim in a showing that the tortious interference caused the emotional injury in question. *See Mooney v. Johnson Cattle Co., Inc.*, 291 Or. 709, 718, 634 P.2d 1333, 1338 (1981). The Vescios have failed to make this showing.

Counsel for the Vescios made statements at trial specifically acknowledging the lack of any connection between the alleged emotional distress and the Bank's exercise of its assignment of rents. Furthermore, emotional distress damages are appropriate in the tortious interference context only where such damages are "reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774 A(1)(c) (1979) (*cited in Trepanier*, 155 Vt. at 271, 583 A.2d at 590). As the Bank correctly argues, "[t]he Vescios' alleged emotional injuries are not of the type that could be reasonably expected to flow exercise of an assignment of rents. If

it were otherwise, every action [involving] adverse economic consequences to someone, and understandably causing emotion distress as well, could be converted into a claim for emotion injury damages." TMB's Proposed Concs. of Law re: Damages at 39.

#### 4. Punitive damages

■ The Vescios are not entitled to recover punitive damages. The first reason for this is that the Vescios failed to plead the elements required for recovery of punitive damages; rather, they simply asked the Court to award them in their prayer for relief. Punitive damages are not mentioned in any of the individual counts against TMB, nor are there allegations of specific conduct that could support an award of punitive damages. Only one of the elements required for an award of punitive damages—"actual malice"—is even alluded to, and then only in Count VII ("Negligent Supervision"), in which the Vescios allege that the Bank negligently supervised George Cooke and Dan Yates, allowing them to act "unreasonably and/or maliciously." The other counts do not even mention the word malice. Thus, the Vescios have failed to make the proper pleading for an award of punitive damages.

Even if the Vescios had pled punitive damages properly, the failed at trial to prove any of the elements required for punitive damages for any of their claims. First, they failed to prove actual malice by any TMB employee. Second, they failed to prove that the actions of TMB employees complained of impute liability to TMB. Third, they failed to prove actual damages from any of their claims.

#### a. Actual malice

■ Under Vermont law, for a plaintiff to carry his or her burden of showing actual malice, he or she must prove "conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." *Schnabel v. Nordic Toyota, Inc.*, 168 Vt. 354, 362, 721 A.2d 114, 120 (1998) (citation omitted).

The Court finds insufficient evidence to establish that any Bank officers demonstrated malice in their dealings with the Vescios. Yates' behavior proved just the opposite. Yates continued to extend credit to the Vescios at the Vescios' request well beyond the Bank's initial investment in the project. He trusted the Vescios with decision-making authority over the operation of the Phase II project. His decision to require an SBA-guarantee for the construction loan reflected sound business judgment as opposed to malice.

Similarly, Cooke and Westgate made sincere efforts to resolve the dispute with the Vescios during the workout period. Numerous offers were extended to the Vescios which involved substantial reductions in the amounts owed to TMB. Eventually, the Bank was willing to accept $1 million of the $2 million debt. The Bank's decision to exercise the assignment of rents in February 1995 came only after the Vescios had been in default on their loans for six months and were putting the Bank's security interest in jeopardy. Again, the Court sees no evidence of personal ill-will on the part of the Bank or any of its employee which would justify the awarding of punitive damages.

#### b. TMB's liability

■ A plaintiff may recover punitive damages against a corporation for the actions of its employees only when the "malicious or unlawful act relied upon [was] that of the governing officers of the corporation or one lawfully exercising their authority, or, if the act relied upon [was]

that of a servant or agent of the corporation, it [is] clearly shown that the governing officers either directed the act, participated in it, or subsequently ratified it." *Shortle v. C.V.P.S.,* 137 Vt. 32, 33, 399 A.2d 517, 518 (1979). The Vescios offered no evidence that Yates or Cooke were governing officers of TMB. Neither of them sat on policy making boards. Each reported to supervisors during the course of their jobs. Nor did the Vescios prove that the governing officers of the Bank ratified or directed their activities. Punitive damages against the corporation are therefore impermissible.

### c. Actual damages

 Actual damages, under Vermont law, are required for the imposition of punitive damages. *See McCormick v. McCormick,* 159 Vt. 472, 479, 621 A.2d 238, 243 (1993); *Powers v. Judd,* 150 Vt. 290, 294, 553 A.2d 139, 141 (1988). Moreover, in Vermont, actual damages mean compensatory damages (rather than nominal damages). *See Doria v. Univ. of Vt.,* 156 Vt. 114, 119, 589 A.2d 317, 319 (1991); *see also BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 580–81, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (recognizing the importance of actual damages as a predicate for the evaluation of punitive damages as a matter of constitutional due process). Thus, even if the Vescios could fulfill the other requirements for an award of punitive damages, their failure to make any showing of actual damages precludes the Court from awarding punitive damages.

The Court's findings that the Vescios failed to prove damages resolves the case. However, even if damages had been proven, the Vescios also had to establish that those damages were caused by TMB. The Court now turns more fully to this second issue, that of proximate cause.

### B. Lender liability arising from control

In connection with this claim, the Vescios allege that

[f]rom June 1992 forward, Merchants dominated, controlled, and/or actually managed the Vescios' financial affairs related to the project, including but not limited to: imposing restraints on the Vescios' financial options; prohibiting the Vescios from seeking funds from sources other than Merchants; instructing the Vescios as to which of their creditors were to be paid; closely supervising the progress of the project; claiming priority over all other creditors; controlling and asserting undue influence over the Vescios' business operations since 1994; coercing them into continuing with the project when they preferred to abandon it; and causing the Vescios to become financially dependent on Merchants.

Am. Affirmative Defenses and Countercls. ¶ 16 (Bankr.Paper 89) [hereafter, "Vescios' Compl."]. The Vescios further alleged that "[d]ue to the domination, control, and/or actual management described in the immediately preceding paragraph, the Vescios became an instrumentality of Merchants in relation to financing for the project." *Id.* ¶ 17.

 The Court finds that the Bank did not dominate, control, or manage the Vescios' business affairs. The Vescios were the ones who went to the Bank and proposed the opening of the grocery store. The Vescios negotiated (or attempted to negotiate) with all of the third parties involved in their project, such as Wetterau, Bozzuto's and the SBA. The Vescios—and not the Bank—selected and dealt directly with the contractors and subcontractors involved in the project. The Vescios managed the store, and the Vescios controlled their own bank accounts. TMB did not impose un-

reasonable restraints on the Vescios' financial options. Rather, the Vescios said they would seek out the best financing terms for their project available from any source, and TMB in no way restricted them from seeking such assistance. Given all of these facts, the Bank cannot be liable under the theory that it controlled or managed the Vescios' affairs. Moreover, even if some of the Vescios' allegations are true (such as that the Bank closely supervised the progress of their project), such allegations do not support a finding of lender liability.

### C. Contractual bad faith

The Vescios allege that TMB breached its duty of good faith and fair dealing arising out of the loan contract. The Court disagrees.

Since there was no contract until the Vescios executed and returned the Second Loan Commitment Letter to the Bank no earlier than March 3, 1993, none of the conduct prior to that date can be relevant to this claim. With regard to conduct after that date, the Vescios have failed to show that the Bank breached its duty of good faith and fair dealing.

▇▇▇ Under Vermont law, an obligation of good faith and fair dealing is implied in all contracts. *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208 635 A.2d 1211, 1216 (1993). As the Vermont Supreme Court has stated:

Each party to a contract makes the implied promise that each will not do anything to undermine or destroy the other's rights to receive the benefits of the agreement. The purpose of the implied covenant of good faith and fair dealing is to ensure that parties act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. Conduct involving bad faith is characterized as violating community standards of decency, fairness or reasonableness.

*Southface Condo. Owners Ass'n v. Southface Condo. Ass'n,* 169 Vt. 243, 246, 733 A.2d 55, 58 (Vt.1999) (citations and internal quotation marks omitted).

▇▇▇ In *Southface,* the Vermont Supreme Court addressed a claim of breach of good faith and fair dealing in the context of a loan contract. In reversing the lower court's decision to allow the claim to go to the jury, the Court reasoned that "the factual question is whether [the lender/defendant] adhered to the agreed common purpose of the contract consistent with the justified expectations of [the borrower/plaintiff] . . . ." *Id.* The plaintiffs alleged that the defendants owed them a duty to ensure that sufficient funds were set aside for a later phase of their project; in rejecting plaintiffs' claim, the court held that the loan agreement was devoid of language that defendants owed them any such duty. *See id.* at 247, 733 A.2d at 58. Importantly, the court also held that "[b]ad faith cannot be inferred from the expected course of business. If bad faith infiltrated the transaction, it must appear that [the parties] acted beyond merely observing the terms of the loan agreement." *Id.* (citation omitted).

▇▇▇ The Court agrees with TMB that, the Vescios may not rely on the covenant of good faith and fair dealing to argue that TMB is liable for 'withholding its approval for a significant part of the financing,' or that Yates breached this covenant by continuing to insist on an SBA guarantee after his superior gave him authority to close the loan with or without such guarantee as he thought fit. Until the 2nd Loan Commitment Letter was signed and returned, TMB had every right to 'withhold' financing for any reason at all . . . .

TMB's Proposed Concs. of Law re: Liability at 15–16 (citations omitted). Furthermore, after there was a contract, the Bank had a right to withhold financing until its conditions were satisfied under the terms of the agreement. Some of the actions taken by the Bank officers which the Vescios raised during trial in connection with this claim were actions expressly authorized under the terms of the loan agreement, such as the Bank's exercise of its assignment of rents. Other issues identified at trial, such as capitalization of interest, are unpleaded, and the Vescios have failed to prove any damages stemming from them. As TMB correctly argues, it

> was legally entitled to call its notes upon default, and had no obligation to refinance the Vescios' loans or make further loans, regardless of bank liquidity. The Vescios make no claim that their notes and mortgages were not assignable. TMB was thus (i) entitled to try to realize whatever it could on its loans, (ii) entitled to negotiate with the Vescios for a possible pay-off with funds obtained from a new lender, at a large loss to TMB, and (iii) equally entitled to see to AMRESCO at an even larger loss. 'Liquidity' is beside the point. The loans were in default and TMB was entitled to exercise its rights, including rights to negotiate with the Vescios (which it had no obligation to do), or to sell the loans at any time.

TMB's Proposed Concs. of Law re: Liability at 23.

The Vescios raise particular concerns over specific acts or series of acts committed by TMB. The Vescios assert that TMB's workout proposals were a sham, designed to string the Vescios along while pursuing foreclosure. The Court disagrees. The outstanding loan totaled approximately $2 million at the time of the filing for foreclosure. During the course of these negotiations, TMB reduced its buy-out offer to $1 million, an offer that was clearly acceptable to the Vescios' representatives. Proposals made by those representatives were accepted by the Bank, only to then be rejected by the Vescios. The Vescios refused to accept any offer that had a drop-dead date, a requirement that is customary within workout proposals. In no way were these offers by TMB a sham.

The Vescios also object to Yates' back-dating of a second security agreement in 1994 to July 1993. The original security agreement drafted on an SBA form adequately covered after-acquired collateral, so that the back-dating of the second security agreement had no effect. Yates ordered the back-dating so that the second security document complied with the initial documents related to the loan without being on an SBA form. The purpose was innocent enough, although clearly misguided. However, since its impact was negligible, it does not constitute grounds for breach of contract or a violation of the duty of good faith and fair dealing by the Bank. As expressed by Richard Clark, TMB's expert witness, the issue of the back-dated security agreement was a red herring.

The Vescios also complain about Cooke's and Westgate's decision to allege a count of fraud in the foreclosure action as an improper technique to forestall Vescios' choice to file for bankruptcy protection. They point to Cooke's e-mail message which suggests such a filing had the purpose of preventing a bankruptcy filing. However, at the time of the filing of the foreclosure action, TMB reasonably concluded Mr. Vescio did in fact engage in an effort to defraud it. Mr. Vescio never indicated that the collateral for the store would be held in NSC Corporation's name, and the UCC–1 form sent by him to the

Bank was extraordinary in that the debtor's identification was omitted. The Vescios delayed responding to the Bank's request for additional information about the creation of NSC Corporation. Based upon this information, TMB reasonably concluded that Mr. Vescio knowingly and intentionally engaged in fraud, resulting in its loss of a security interest in the grocery store assets.

## D. Breach of contract

█ The Vescios allege that "[a]n express or implied term of th[e] loan contract was that Merchants, through its officers, agents, and employees, would perform and/or enforce the terms of the contract in the same manner as a reasonably prudent lender." Vescios' Compl. ¶ 27. The Vescios' breach of contract claim is simply a claim that TMB failed to fulfill this express or implied term, i.e., it failed "to perform and/or enforce the contract in a reasonably prudent manner." *Id.* ¶ 28.

The Court's review of the Vescios' Proposed Findings of Fact leave it in the dark as to the facts upon which the Vescios rely to support their breach of contract claim. Certainly there is no claim that TMB breached its agreement to sell the hardware store assets to the Vescios. The allegation that TMB engaged in a nefarious plot to hide its transgressions by staying discovery during negotiations is without merit. Such an arrangement was made voluntarily by the lawyers as the parties tried to settle the various issues, and a stay of discovery is very common in such circumstances.

The Vescios complain that TMB was at fault for not transferring its construction loan to permanent financing at Mrs. Vescio's request. They argue that they could have made the payments had such an arrangement been completed. In fact, there were no promises expressed to them regarding permanent financing. More importantly, the payments they were making during the relevant period had been amortized over a twenty year period. That means that the payments would not have been altered in any significant way, even if permanent financing had been arranged. Since the Vescios defaulted on their loans well before the balloon payments were due, they suffered absolutely no prejudice by the Bank's failure to proceed to a permanent financing arrangement.

The Court finds no merit to the Vescios' claim that TMB breached its contractual obligations.

## E. Tortious interference with contract

The Vescios describe their tortious interference claim in the following way:

> Throughout the course of the dealings between Merchants and the Vescios, Merchants has engaged in a pattern of intentional and/or negligent interference with the contractual and business relationships between the Vescios and third parties involved in the project. Such interference includes but is not limited to Merchants' direct contact of the Vescios' commercial tenants and statements to said tenants to the effect that all commercial lease payments were to be made directly to Merchants where Merchants was given no such authorization by the Vescios or at law.

Vescios' Compl. ¶ 31. The Vescios rely principally upon TMB's exercise of the assignment of rents in February 1995 in their complaint to establish a claim of tortious interference with contract.

█ A claim of tortious interference with contract requires the party asserting it to prove that the defendant improperly caused someone not to perform its contract with the plaintiff. *Williams v.*

*Chittenden Trust Co.,* 145 Vt. 76, 80, 484 A.2d 911, 913 (1984). In the instant case, there was nothing improper about TMB's exercise of its assignment of rents. The Vescios agreed to the assignment of rent provision of the relevant security agreements knowingly and voluntarily. At the time of TMB's exercise of the assignment of rents, the Vescios had been in default on their loans for over six months, back taxes were due on Phase I, and the Phase I lenders were not being paid. There were no contractual restrictions on the assignment, and Attorney Westgate chose to exercise the assignment to ensure that cash generated from the rents on Phase I was used to service the first mortgage, to pay taxes and to maintain the property. Failure to exercise the assignment could have resulted in reduced value of the collateral for both the first and second mortgage holder. Significantly, the Vescios waited until July 1995 to complain about the exercise of the assignment and remained able to pay their attorneys during the extended negotiations.

The Vescios raised two other claims for tortious interference with contract in their proposed findings: (1) that the Bank directed the Vescios to pay Hal Wilkins; and (2) that the Bank incompetently dealt with FDIC. The Vescios failed to show how these acts, even if true, interfered with their contracts with others. Moreover, there is no factual basis for the claims. The Vescios had the ability to decide who was to be paid out of the construction loan with little or no interference from Yates or TMB. Yates did not make a specific demand that Wilkins be paid. To the contrary, Yates permitted Mr. Vescio to take over Wilkins' function as clerk of the works.

The Vescios' assertion that TMB incompetently dealt with FDIC is also without substance. The Vescios negotiated directly with the other banks and FDIC, and TMB played no role in such efforts. Initially, Mr. Vescio claimed he had obtained a subordination agreement with FNBV in the amount of $350,000, although such an agreement was not confirmed in writing. FDIC took over FNBV's interest and rejected that proposed settlement. Eventually, the Vescios and FDIC agreed upon $425,000, and TMB permitted them to use the construction loan to fund this settlement upon Mr. Vescio's promise to supply replacement funding, a promise that was not kept. The Bank is not responsible in any way for the Vescios' efforts at negotiations with FDIC.

### F. Fraud and Negligent Misrepresentation

In support of their claim for fraud, the Vescios allege that

Merchants, through its officers, agents, and employees, intentionally made misrepresentations or omissions of fact to the Vescios regarding then-existing facts to affect the essence of its transactions with the Vescios in regard to financing of the project, including but not limited to: a false statement by its officer Dan Yates made in or about June 1992 that a loan for which the Vescios applied prior to June 1992 "would close within 10 to 14 days" (or words to that effect); a false statement by ... Yates made in or about the second week of July 1992 that this same loan would be approved "within a few days" (or words to that effect) of the second week of July 1992; a false statement by ... Yates made in or about December 1992 that approval of this same loan would be delayed because, according to Mr. Yates, the [SBA] had to wait to give its approval of the loan until January 1993 when Congress professedly was to reauthorize the SBA's funding, or words to that effect;

a statement by Mr. Yates that the Board would review the loan.

Vescios' Compl. ¶ 34. The Vescios further allege that "[t]he subject matter described by Dan Yates in these statements, as well as any other false statements made by Merchants, or concealment or failure to disclose facts, was known to officers, employees or agents of Merchants to be false at the time these statements were made to the Vescios." *Id.* ¶ 35.[4]

The Vescios' negligent misrepresentation/constructive fraud claim contains all of the same allegations in the previous count, except that instead of complaining that Yates told them that the Board would review the loan, they complain about TMB's "failure to disclose misapplication of loan proceeds and failure to disclose alleged default by the Vescios on certain loan transactions." Vescios' Compl. ¶ 40. Moreover, in connection with this claim, the Vescios allege that the false statements or "failure to disclose material facts as to which the bank had a duty of disclosure" on the part of the Bank's officers "was known or reasonably should have been known to officers, employees or agents of Merchants to be false at the time these statements were made to the Vescios." *Id.* ¶ 41.[5]

The Court has already found that Yates never made representations to the Vescios in the spring of 1992 that the closing on the construction loan would occur within ten or fourteen days. The Vescios had just notified Yates that Wetterau, the proposed tenant for the grocery store, had withdrawn from the project. Wetterau's involvement had been a condition to the Bank's funding the project, so that it is inconceivable that Yates would have agreed to go forward so quickly without further study. Moreover, even if such representations had been made, reliance upon such statements would not have been reasonable for any significant length of time. The Vescios knew they needed a SBA guarantee, and it soon became clear to them they needed to negotiate further with SBA to obtain SBA approval. They would have also known a closing was not possible until those negotiations bore fruit. Any misrepresentations concerning a quick closing cannot support a fraud or negligent misrepresentation claim.

The Vescios also complain about Yates' statement that SBA had run out of money in December 1992, thereby delaying any possible closing. The Court has already found that such statements were in fact true, according to SBA's Valerie Morse. Finally, as noted earlier, the Vescios fail to show how they were harmed by the statements about an impending closing date or a delay in the closing.

In the negligent misrepresentation count, the Vescios argue the Bank failed to disclose misapplication of funds arising out of the construction loan for expenses unrelated to the project. Construction loan funds were used to pay other obligations. The evidence at trial proved that such use of the construction loan funds was authorized and with the consent of the Vescios. Mrs. Vescio was in particular aware of how those funds were being expended, since she was in charge of the accounts. She used some of those funds to pay personal expenses, including college tuition costs, without interference from the Bank.

---

4. The Vescios also claim that the "correct information regarding the subject matter [of such false statements] was unavailable to the Vescios." *Id.* ¶ 36.

5. Again, the Vescios allege that the "correct information regarding the subject matter [of such statements] was unavailable to the Vescios." *Id.* ¶ 42.

### G. Negligence and Negligent Supervision

With respect to their negligence claim, the Vescios alleged that TMB breached its "duty to act in the same manner as a reasonable lending institution or bank in its lending relationship with the Vescios," Vescios' Compl. ¶ 46, "by advising and/or coercing the Vescios to incur ill-advised financial obligations against their wishes, by poorly managing the Vescios' financial affairs, by advising and/or coercing the Vescios to use their home as collateral for loans from [TMB], by employing improper loan application procedures, by employing improper loan administration and workout procedures, and in other ways." Id. ¶ 47.

In connection with their negligent supervision claim, the Vescios allege that TMB breached its "duty to act in the same manner as a reasonable lending institution or bank in supervising its officers, agents, and employees," Vescios' Compl. ¶ 50, "by allowing certain of its officers, including but not limited to George Cooke and Dan Yates, to act unreasonably and/or maliciously in handling of loans to and the financial affairs of the Vescios." Id. ¶ 51.

TMB responds to the negligence and negligent supervision counts by suggesting that it did not owe a duty of care to the borrower cognizable in tort law. In light of the Court's factual findings, I do not need to address the issue of a duty of care arising out of a lending relationship. The Court finds these claims to lack merit factually. Although the complaint does not identify the specific negligence claims raised by the Vescios, I turn to some of their areas of concern.

#### a. The Hardware Store Loan

The Vescios seek to recover for negligence involving the hardware store loan on two grounds. First, they claim Yates engaged in conflict of interest transaction by selling the Vescios the hardware store assets for $75,000 rather than by putting the property up for auction. Presumably, this apparent conflict of interest led Yates to fail to disclose the liquidation value of the property. Second, the Vescios claim Yates was negligent by permitting them to go forward with the closing on the hardware store. This second claim seems to assume that Yates had a duty to the Vescios to advise them about the reliability of their business plans.

Yates clearly owed a duty to Fitch to sell the hardware store collateral at a reasonable price, since the proceeds of that sale reduced Fitch's outstanding obligation to TMB. Mr. Vescio was keenly aware of that fact, since he worked with Fitch prior to taking over the store. Yates should have told the Vescios directly of the Bank's responsibility to Fitch in regard to the price of the collateral. But there is no duty for Bank officers to disclose to potential buyers a liquidation value of property to be sold. TMB sold the collateral well below fair market value with the knowledge and at the urging of Mr. Vescio. It breached no duty to the Vescios by selling the property well below fair market value.

The Vescios claim that Yates should have advised them about the risk inherent in the hardware store. Mr. Vescio, however, had full access to all of Fitch's business records. He surmised that, by getting the collateral at below fair market value and by changing the focus of the business to retail customers, he could operate a successful business. Fitch agreed with him. Yates' involvement was only to provide financing for the purchase of the collateral and start-up costs, not to render an expert opinion regarding the likelihood of success of the business. There has been no showing that the mere providing of financing for the hardware store was negligent.

■ The Vescios also object to the Bank's failure to provide adequate supervision of Yates by senior officers. According to Yates' supervisors, he was highly respected as a prudent loan officer. They remained available to him for consultation and felt that such supervision in regard to the hardware store loan was appropriate and satisfied generally adopted banking standards. The Court agrees. There was nothing so unusual about funding the hardware store project that would require more direct supervision of this experienced lending officer.

### b. Construction Loan

■ The Vescios object to the Bank's use of construction funds for costs unrelated to the project, including capitalization of interest in regard to other loans owed by them. As noted above, such expenditures were made with the Vescios' consent and often at their direction. These expenditures were frequently necessary to avoid default in other loans. Although capitalization of interest is generally frowned upon by lending institutions, there is nothing improper about such practices, especially when done with the knowledge and consent of the borrower.

The Vescios also raise a new issue in their post-trial filings, that is, that the Bank deceived them in regard to reducing the amount of the construction loan. They had contended that they expected to be able to use $950,000 for the Phase II project. That figure was reduced to $750,000 with their full knowledge during their negotiations with SBA. They now also claim that Yates reduced funds to be used for construction costs by shifting those moneys to purchase of inventory, all without the Vescios' knowledge. The claim is without merit. Initially, the Vescios applied for total funding of $1,400,000, of which $575,000 was dedicated to construction

costs. At the end of the negotiations and at the time of construction of the building, $500,000 was dedicated to those construction costs, with an additional $75,000 coming to them in the form of standby loans from Brickstone. In other words, the amount dedicated to construction of the grocery store was virtually the same. Moreover, even if there had been a small reduction in the amount of funds going to construction of the building, the Vescios have failed to translate that reduction to losses into them.

The Vescios have failed to prove TMB or its agents were negligent in its administering of the construction loans.

### c. The Workout Phase

■ The Vescios reassert their objections to the manner in which Cooke and Westgate conducted workout negotiations. They allege that the Bank officer and attorneys engaged in sham negotiations. As noted earlier, the Court disagrees. Cooke and Westgate put forth legitimate proposals to resolve the dispute with the Vescios, suggesting a substantial reduction in their demands over time. The exercise of the assignment of rents was done in good faith to protect the Bank's security interest in Phase I assets after the Vescios were six months in default. The Vescios' complaints of Cooke's threatening and derogatory behavior were unsubstantiated by others who were parties to the negotiations. Drop-dead dates are customary to workout agreements, and the Vescios' refusal to consider such provisions was the cause of the failure to work out a solution. The Bank's decision to sell their loans to AMRESCO was made after it had assured itself that AMRESCO was a reputable company. That conclusion was affirmed by AMRESCO's initial decision to reassert the $1 million offer to the Vescios soon after purchase of the loans.

## IV. Conclusion

Wherefore, for the reasons stated above, the Court hereby awards judgment in favor of Counterclaim Defendant TMB.

CASE CLOSED.